[Civ. No. 24372.   First Dist., Div. Two.   May 26, 1969.]

J. W. MAILLIARD III et al., Plaintiffs and Respondents, v. WILLOW CREEK RANCH CO. et al., Defendants and Appellants.

Poindexter & Barger and Alfred B. Doutré for Defendants and Appellants.

Doyle & Clecak and William P. Clecak for Plaintiffs and Respondents.

AGEE, J.—In this declaratory relief action, plaintiffs-respondents are the assignees of the grantees of a timber

grant executed on June 2, 1958 by one Baxman and wife to respondents' assignors. The purchase price was $30,000 and the grant was recorded on June 4, 1958. The subject timber is on a 3,600-acre tract located near Jenner, Sonoma County, and the land and timber were owned, prior to the above sale of the timber, by the Baxmans. The land will be referred to herein as the Baxman Ranch.

The timber grant provided that Baxman and wife granted to respondents' assignors "all of the merchantable timber on grantors' ranch," including "the right to clear cut the area down to *any size diameter grantees deem merchantable.* . . . Grantees have eight years in which to remove the timber provided that if the timber is not all removed in eight years, then Grantees may have *additional time* to remove it upon paying to Grantors the sum of $250.00 for each additional year necessary or desirable." (Italics added.)

On or about February 20, 1961, the original grantees under the timber grant assigned all of their interest therein to respondents. This assignment was recorded on February 23, 1961. On December 28, 1962, the Baxmans sold the subject land to the appellants, who had actual and constructive knowledge of said timber grant and its terms.

On January 16, 1964 appellants' attorney wrote to respondents, questioning the validity of respondents' timber grant and their right to harvest any of the timber on the subject property except that which was merchantable as of the time of the original 1958 grant. (Appellants define a "merchantable" tree as one which is at least 18 inches in diameter breast high, i.e., 4½ feet above the ground.)

On September 29, 1964 respondents wrote to appellants, advising them of their intention to extend the timber removal period provided for in the timber grant for an additional period of eight years and enclosing a cashier's check for $2,000 ($250 per year). On October 6, 1964 appellants returned the check, stating that respondents had no right to any extension. On November 12, 1964 respondents filed this declaratory relief action, asking for a declaration of their rights under the timber grant.

The judgment appealed from holds: (1) that respondents are the owners of all of the timber on the subject property and have the right to "clear cut" and remove the same regardless of the size thereof; (2) that respondents, upon payment of $2,000 to appellants, are entitled to an additional period of eight years, from June 2, 1966 to June 2, 1974,

within which to cut and remove all of the timber from said property.

It is not questioned that the owner of timber land may grant the timber independent of the land on which it is standing. (*Buffum v. Texaco, Inc.* (1966) 241 Cal.App.2d 732, 734 [50 Cal.Rptr. 852].)

When the grant is, as here, of "all the merchantable timber" on the grantors' land, the courts will first look to the grant itself for a definition of what the parties intend the term "merchantable timber" to mean.

In the instant case the parties provided that such term was intended to include trees of *any size diameter grantees deem merchantable*. Hence, there is no point in discussing cases in which the term "merchantable timber" is *unqualified* or *not defined* in the agreement or grant in question. It is obvious that the parties here intended to leave it up to the grantees as to what trees they deemed merchantable.

Baxman testified in substance that he desired to turn the subject property into a sheep ranch and that he wanted the land as clear of trees as was possible in order to increase the growth of grass for grazing purposes. This was his objective in granting the right to "clear cut" the entire area and, in doing so, allowing the grantees to cut "down to any size diameter grantees deem merchantable."[1]

We have concluded that the trial court correctly interpreted the timber grant and that there is substantial evidence to support its finding that said grant conveyed to and was intended to convey to the grantees thereunder the "right to remove all the timber from the said real property, *regardless of size.*" (Italics added.)

Respondents did not acquire a right to the timber on the subject property in *perpetuity*. They expressly concede this, stating that their ownership of such timber is "subject to their right to remove it within a certain number of years. . . . If they cannot remove the timber within that time [8 years plus 8 years], the same reverts to the landowners." In making this concession, respondents have effectively precluded themselves and any of their successors from ever making any "perpetuity claim." Respondents likewise disclaim any

---

[1]The record shows the following: "THE COURT: . . . [I]t didn't make any difference to you, the more they cut the better it would be for you; isn't that right? A. [by Baxman] That's kind of the way I felt. Q. And you were making your money off of the sheep and the more that they could cut of the timber the more grass you would have and the more sheep you could run? A. That's the way I felt."

interest in any trees that were not in existence on June 2, 1958.

■ Appellants contend that the trial court granted relief beyond the prayer of the complaint in that the prayer asks that the court "determine that plaintiffs have the present right to remove all *merchantable timber* from the land involved herein" and the judgment decrees that "plaintiffs have the right to remove all of the timber from the said real property *regardless of the size thereof.*" (Italics added.)

It is obvious that respondents' pleadings are based upon the theory that the parties to the timber grant, by the language used therein, intended that "merchantable timber" should mean trees of "any size diameter grantees deem merchantable." Hence, the relief granted is not beyond the prayer of the respondents' complaint.

■ Appellants contend that respondents are restricted in their cutting of trees to those of a size which the original grantees cut during the period from June 2, 1958 to February 20, 1961, when the timber grant was transferred to respondents.

This would indeed be a strained interpretation of the terms of the grant and one that neither the trial court nor we deem reasonable. It is understandable that the original grantees would select the most profitable trees at the outset and recoup their capital investment as soon as possible. That they did so does not destroy their right, under the clear terms of the grant, "to clear cut the area down to any size diameter grantees deem merchantable." The mere fact that in the early years of the grant period the larger trees were selected for cutting does not mean that the grantees were abandoning their right to cut smaller trees in the future.

We reject, as did the trial court, appellants' argument that "the original grantees by their practice in cutting trees having a ["breast high"] diameter of 18 inches or more from the date of the Timber Grant in 1958 until the time of the assignment of the Grant in 1961, thus made a determination of the meaning of 'merchantable.' "

Appellants cite and rely upon *Buffum* v. *Texaco, Inc., supra,* 241 Cal.App.2d 732, for the proposition that respondents were only entitled to the merchantable timber on the subject property *at the time of the timber grant,* June 2, 1958. This contention is, of course, motivated by the fact that trees which appellants contend were not "merchantable" on June 2, 1958, would grow sufficiently during the life of the timber

grant to become "merchantable."

In *Buffum, supra,* 241 Cal.App.2d 732, the owner of timber land (Tompkins) deeded to Humboldt Milling Co. " 'all of the timber standing, lying, and contained' " on said land. The court said: "It is generally held that the word 'timber' *unless modified or controlled by other expressions* in an instrument means trees fit to be used for lumber in building or construction." (Italics added.)

The court held that when Tompkins granted "all of the timber" he intended to convey to Humboldt and the latter intended to acquire, "all of the *merchantable* timber *then* on the property." (Italics added.)

In the instant case, the timber grant expressly defines merchantable timber as trees of "any size diameter grantees deem merchantable." Therefore, the definition of timber set forth in the *Buffum* case is not applicable here because, in the language of *Buffum,* the word "timber" was "modified or controlled by other expressions in an instrument."

### Validity of Extension

■ The timber grant of June 2, 1958 expressly provides: "Grantees have eight years in which to remove the timber provided that if the timber is not all removed in eight years, then Grantees may have additional time to remove it upon paying to Grantors the sum of $250.00 for each additional year necessary or desirable."

It is clear that the right of the grantees to "additional time" is only limited by what they deem "desirable," impliedly qualified by the requirement that the period of any such extension shall be reasonable and within the intention of the parties to the grant, i.e., Baxman and the original grantees.

■ The trial court made the following finding of fact: "That it is necessary and desirable for plaintiffs to have eight (8) years from and after June 2, 1966, namely, until June 2, 1974, to cut and remove all of said timber from said real property. That the said eight (8) year period is also a reasonable time within which to cut and remove said timber from said real property."

The question is therefore limited to whether, viewing the evidence in the light most favorable to respondents, the period of the extension *desired* by respondents is reasonable, there being no issue as to the fact that respondents do have such desire.

The reasons for the request by respondents for an eight-year extension of the timber grant were testified to by one

Wallen, a consulting forester by profession. His testimony covers 322 pages of the reporter's transcript and, as a part thereof, he stated the reasons why respondents *desired* such extension.

Among these reasons were the difficulty in obtaining the services of a competent and responsible logging operator to cut the timber, the burning down of the sawmill of the oper-ator (Scheer) with whom they had entered into a contract on May 12, 1964, which sawmill had not been put back into oper-ating condition by the time of trial, December 1965, economic conditions relating to the marketability of the type of timber on the subject property, and numerous other reasons, all of which make it *"desirable"* for the respondents to seek an extension of the original removal period provided for in the timber grant. (Italics added.)

Wallen testified: "Well, our original contract when we bought it didn't specify any particular extension. But we felt that eight years would be a reasonable extension. . . . Obvi-ously, we need more time in which to remove the timber and when we purchased the contract we didn't figure there would be any problem at all with, with the contract on the face of it, that it appeared to be straightforward."

Wallen's reference to the "face" of the contract (timber grant) is obviously to the provision therein that grantees could have "additional time" to remove the timber if they deemed it "desirable."

Baxman, the grantor under the timber grant, "figured" that the grantees might desire "additional time" of as much as *ten* years and he indicated that the grant was so worded in order to provide for such a contingency.

Baxman's testimony in this respect is as follows: "Q. Now, with regard to this question of extension of time that you have mentioned, Mr. Baxman, isn't it true that in your dis-cussions concerning the time, if they didn't remove all the timber in eight years they could have an option for additional time, whatever they wished; isn't that true? A. Well, that wasn't decided that way. We did decide, we kicked it around that they would have additional time, but I don't think any particular time was mentioned. Q. Well, that is what I am saying, not a particluar length of time, but *whatever addi-tional time they wished?* A. *That's right.* It was something to that sort." He later testified: "Q. What was your impression at that time, what did you think about this $250 a year [dur-ing the "additional" years], would you only get that once or

twice, or every year, or all at one time? A. I figured that they would pay that as the years come on, because at that time they didn't know whether they would want one year or two years or *ten*. And I just figured every year." (Italics added.)

When the testimony was completed, the court made certain statements in the nature of an oral opinion. It indicated that it intended to accept the testimony of Wallen with respect to the length of the extension period, stating: "We are still up against the rather uncertain length of the extension. It was to be according to necessity or desire, whim. That brings us right down to the nub. What is the testimony in this case? I have to decide this on facts, not theories. What is the testimony? Aside from Mr. MacDougall's testimony, which I respect but do not regard at the same level that I consider Mr. Wallen's testimony as an expert, he indicated the length of time he thought it could be taken off. I frankly think it's too short. It was his estimate, you see.

"So the only testimony that I have is the testimony of Mr. Wallen, virtually. There may be others. I am not ignoring my notes. I reviewed them last night. Mr. Wallen's testimony the other day was that he needed a certain number of years [eight]."

We have concluded that the eight-year extension period allowed by the trial court in its judgment was reasonable and proper.

Appellants have devoted a considerable amount of their argument to the proposition that the respondents must cut the timber on the subject property in accordance with and subordinate to the Forest Practice Rules of the State Department of Forestry. (See Pub. Resources Code, div. 4, ch. 10, §§ 4901-4972.)

This issue was not listed in the pretrial order as one of the issues to be determined nor was it even mentioned therein. The trial court did not mention the subject in its findings, conclusions, or judgment and we see no reason to discuss it herein.

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred.